UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM NO. 3:12CR221(RNC) |
| v. | |
| SAMUEL RIVERA, | June 10, 2013 |
| Defendant. | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

In May and June 2011, the defendant joined with his estranged wife, Dana Rivera, to participate in the commercial sexual exploitation of a 16-year-old girl. Given the seriousness of the defendant's conduct, and other factors more fully discussed below, the Government urges the Court to sentence the defendant to a term of imprisonment within the advisory Guidelines range of 78 to 97 months.

I. **INTRODUCTION AND BACKGROUND**

On October 18, 2012, a federal grand jury in New Haven returned a two-count indictment charging both Samuel Rivera ("the defendant") and Dana Rivera ("D. Rivera") in Count One with Conspiracy to Commit Sex Trafficking of a Minor, in violation of 18 U.S.C. § 1594(c), and in Count Two with Sex Trafficking of a Minor, in violation of 18 U.S.C. § 1591(a)(1), (b)(2), and (c). D. Rivera was arrested on November 5, 2012, and ordered detained. The defendant was arrested on November 16, 2012, and was also ordered detained.

On February 14, 2013, D. Rivera pleaded guilty to Count One of the Indictment, Conspiracy to Commit Sex Trafficking, before the Honorable Donna F. Martinez, United States Magistrate Judge. In connection with her guilty plea, D. Rivera entered into a plea agreement in which she and the Government agreed that the advisory Sentencing Guidelines range is 87 to 108

months' imprisonment. Moreover, D. Rivera agreed not to argue for a sentence below 78 months' imprisonment. On May 8, 2013, the Court sentenced D. Rivera to 78 months' imprisonment, followed by 7 years of supervised release.

On February 19, 2013, the defendant also pleaded guilty to Count One of the Indictment, Conspiracy to Commit Sex Trafficking, also before Judge Martinez. In connection with his guilty plea, the defendant entered into a plea agreement in which he and the Government agreed that the advisory Sentencing Guidelines range is 78 to 97 months' imprisonment. Moreover, the defendant and the Government agreed not to seek a sentence outside the Guidelines range.

## II.  FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

The Government's version of offense conduct in this case has been substantially restated in the Presentence Report, and is recounted again here.

Beginning in late 2010 and continuing through June 15, 2011, D. Rivera arranged for the prostitution of a 16-year-old girl ("MV-1") whom she knew to have been previously victimized as a 14-year-old by another pimp. Initially D. Rivera's prostitution of MV-1 was sporadic, as MV-1 was then a permanent resident of a residential treatment facility for girls in Massachusetts. D. Rivera primarily worked with MV-1 while MV-1 was home on weekend passes. However, in May 2011, MV-1 ran away while on a home pass and was picked up by D. Rivera and her estranged husband, the defendant. For the ensuing several weeks, the defendant and D. Rivera provided for the victim's prostitution at locations in Connecticut, New Hampshire, and Rhode Island. They posted advertisements on the Internet, took calls of prospective customers, booked hotel rooms, and transported MV-1 to and from prostitution calls. Ultimately, the operation

2

ended on June 15, 2011, when a tip led police to a hotel where they found MV-1 with both the defendant and D. Rivera.

MV-1, who was born in September 1994, first became involved in prostitution in approximately December 2009, when she was living in Ledyard and met Matthew Lallis at a Dunkin Donuts. Lallis quickly befriended MV-1, started "dating" her, and after a short period of time, MV-1 started working as a prostitute for Lallis. Lallis was threatening towards MV-1, raped her, and supplied her with drugs. MV-1's prostitution for Lallis continued until April 2010, when Lallis was arrested by state authorities. Lallis has been convicted and sentenced by the State of Connecticut for his conduct related to MV-1.

While with Lallis, MV-1 met a woman with initials R.S. Both MV-1 and R.S. were staying at the same Super 8 motel at the time. Later, after Lallis was arrested, MV-1 was living at home in Ledyard and was in touch with R.S. R.S., in turn, introduced MV-1 to R.S.'s friend, D. Rivera. According to MV-1, both MV-1 and R.S. told D. Rivera about MV-1's history with Lallis, and about her age (at the time 15). D. Rivera and MV-1 became friends, and MV-1 came to look at D. Rivera as akin to a sister. After a short stay at home, MV-1 was transferred by the Department of Children and Families ("DCF") to the a program in Hartford and then ultimately to "G.L.," a residential treatment facility in Massachusetts.

It was during her home passes from G.L., around Christmas 2010, that D. Rivera first began to put MV-1 to work as a prostitute. According to MV-1, D. Rivera explained that her then-boyfriend, a man with initials T.R., had been in trouble with a state drug case and had no job or place to live, and that by working MV-1 would be helping everyone out – thereby enabling them all to be "one big happy family." Thus began MV-1's second round of

3

prostitution activity, primarily on weekends when she was let out on home passes from G.L. Although MV-1 did not earn home passes every weekend, the overwhelming majority of those she did earn were spent working for D. Rivera and T.R.. T.R. was primarily responsible for driving MV-1 to prostitution appointments (also known as "calls" or "dates"), since D. Rivera had a day job as a Certified Nurse's Assistant (CNA), providing in-home health care to a victim of a traumatic brain injury.

D. Rivera advertised MV-1 for prostitution "dates" using Internet sites such as Craigslist and Adult Friend Finder. D. Rivera posted the ads using her phone, her computer, T.R.'s computer, or D. Rivera's grandmother's computer. D. Rivera would field most of the calls and then tell T.R. where to take MV-1, although occasionally MV-1 would get on the phone. D. Rivera took most of the pictures to post MV-1, though T.R. (and later the defendant) did as well. D. Rivera and T.R. (and later the defendant) collected all money made by MV-1, and would buy MV-1 what she needed.

In January 2011, T.R. went to jail on his previously pending drug case. In approximately May 2011, as she came home on a weekend pass from G.L., MV-1 was having problems with her mother and was considering running away. She spoke to D. Rivera on the phone, and D. Rivera told her that she was outside MV-1's mother's house, and MV-1 had to come with her. D. Rivera threatened to come to her door, i.e., to tell her mother about what she had been doing, if MV-1 did not come with her. After picking up MV-1, D. Rivera drove to pick up the defendant, who was D. Rivera's estranged husband. Though MV-1 had met the defendant before, this was the beginning of the defendant's everyday involvement in the prostitution

operation. According to MV-1, D. Rivera told the defendant that she and MV-1 were like a family, and if the defendant joined them, he could get 50% of the proceeds.

After picking the defendant up, D. Rivera drove them all to Rhode Island, where MV-1 had sex with a regular customer. They then returned to Connecticut, and MV-1 called a friend, with initials B.C., to pick her up. MV-1 stayed with B.C. and B.C.'s boyfriend for a short time, and then returned to D. Rivera and the defendant. According to MV-1, D. Rivera had been calling MV-1 repeatedly.

At that point, MV-1 started working for D. Rivera and the defendant every day, seeing about 5-6 customers per day. The defendant transported MV-1 to calls and bought her clothes and other necessities. D. Rivera posted most of the advertisements and booked most of the hotel rooms, but the defendant also performed these functions, as needed. Both D. Rivera and the defendant took photos of MV-1 for the ads. D. Rivera and the defendant split the money that MV-1 made – MV-1 got none of it.

D. Rivera and the defendant took MV-1 to several hotels in Connecticut, mostly in the Groton, Niantic, and Mystic area, as well as to places in New Hampshire and Rhode Island. In New Hampshire, MV-1 ended up with a customer (also known as a "john") who was violent and refused to pay her money. D. Rivera became upset because MV-1 didn't get the money, and threatened to leave MV-1 in New Hampshire. According to MV-1, threats came primarily from D. Rivera.

MV-1 reports a short period, maybe a week, where she left the defendant and D. Rivera and stayed with her friend S.B., because she was tired. She then went back to the defendant and D. Rivera.

Ultimately, MV-1's work for the defendant and D. Rivera ended in the early morning of June 15, 2011, when the police discovered the defendant, D. Rivera, and MV-1 at the Ramada Inn in Niantic. The defendant was arrested for violation of a protection order (for the benefit of D. Rivera), D. Rivera was let go, and MV-1 was returned to DCF.

Among the various pieces of evidence corroborating MV-1's account of her victimization, the Government found the following:

1. Stonington Police Reports: On June 15, 2011, after receiving certain intelligence, Stonington Police Department ("SPD") officers located a prostitution customer who had come to an appointment at the Ramada Inn in Mystic. The officers had the customer text the prostitute he was there to meet, and he was instructed to proceed to the rear door. Officers found D. Rivera at the rear door, and then located the defendant attempting to ferry MV-1 out the side door of the hotel.

2. Craigslist provided approximately 56 postings associated with a gmail address set up by D. Rivera, some of which were prostitution advertisements in the casual encounters section, and other were personal ads that were posted for D. Rivera. At least one ad had a nude photo of MV-1's torso.

3. The phone number listed for the Craigslist account, as well as other numbers used in the posts, were subscribed to by D. Rivera, and another number from the posts came back to D. Rivera's grandmother, with whom D. Rivera lived.

4. The Internet Protocol ("IP") addresses associated with creating the Craigslist ads were found to be then in use by: (1) D. Rivera's place of employment; (2) D. Rivera's home (under her grandmother's name); (3) the Motel 6 in Niantic; (4) the America's Best Value

Inn in Niantic; (5) a public library that was about one block from where the defendant lived; and (6) D. Rivera's cell phone.

5. Gmail provided login IP's for the email account used in the Craigslist posts, almost all of which came back to D. Rivera's cell phone; one came back to her employer. There were several emails between the account user and prospective johns.

6. Records of hotel stays include (1) a stay from May 23 to June 2, 2011, in the name of Dana Rivera, at the Motel 6 in New London; (2) a stay between June 2 and 3, 2011, in the name of Dana Rivera, at the America's Best Value Inn in Niantic; and a stay between June 13 and 15, 2011, in the name of Samuel Rivera at the Ramada Inn in Mystic. According to the Motel 6 manager, D. Rivera paid for her stay in cash, and moved rooms because her initial room did not have WiFi access. She paid for WiFi access on several days of her stay, which is consistent with the Craigslist and ISP records. The clerk at the Ramada Inn in Mystic recalled that when the defendant checked into the hotel, he was with two heavy set white women (consistent with D. Rivera and MV-1).

7. Several customers who had sex and/or made appointments with MV-1 were interviewed.

## III. SENTENCING GUIDELINES

The plea agreement in this case reads, in pertinent part, as follows:

The defendant's base offense level under U.S.S.G. § 2X1.1 and 2G1.3(a)(2) is 30. Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 27. Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category II. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate. A total offense level 27, assuming a Criminal

7

> History Category II, would result in a range of 78 to 97 months of imprisonment (sentencing table) and a fine range of $12,500 to $125,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 5 years to life. U.S.S.G. § 5D1.2. The parties agree that neither a downward nor an upward departure from the sentencing range set forth above is warranted and that a sentence within the agreed range is reasonable. Accordingly, neither party will seek a departure or seek any adjustment not set forth herein. Moreover, the defendant will not seek a non-Guidelines sentence. Nor will either party suggest that the Probation Department consider a departure or adjustment not set forth herein, or suggest that the Court *sua sponte* consider a departure or adjustment not identified above.

The PSR agrees with this calculation. In the PSR for D. Rivera, however, the Probation Office opined that two additional enhancements should apply that were not contemplated by the parties in the plea agreement: (1) two levels under U.S.S.G. § 2G1.3(b)(4)(A), where "the offense involved the commission of a sex act or sexual contact;" and (2) two levels under §2G1.3(b)(3)(B) on the basis that "the offense involved the use of a computer to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor." As to the former, the Court agreed that the enhancement did not apply to D. Rivera's case; as to the latter, the Court ruled that the "computer enhancement" should apply, but agreed to downwardly depart to give effect to the plea agreement.

The Government reiterates its position that neither enhancement should apply in this case, for the same reasons articulated in its briefing as to D. Rivera. Specifically with regard to the computer enhancement, while the Government agrees that the plain language of the enhancement appears to cover the facts of this case, the application notes restrict its usage significantly. Specifically, Application Note 4 to U.S.S.G. §2G1.3(b)(3)(B) instructs, in part, that: "Subsection (b)(3) is intended to apply only to the use of a computer or an interactive computer service to

communicate directly with a minor or with a person who exercises custody, care, or supervisory control of the minor."

This enhancement is often used in the context of online enticement cases, where a defendant may use email to solicit sex directly from a minor or someone with custody, care, or control over a minor. *See*, *e.g.*, *United States v. Murrell*, 368 F.3d 1283, 1284, 1289-90 (11th Cir. 2004) (enhancement applied where the defendant communicated with a "father," who was a police officer, about having sex with the father's thirteen-year-old daughter); *United States v. Vance*, 494 F.3d 985, 997 (11th Cir. 2007) (applying the enhancement where defendant communicated with an undercover officer whom he believed exercised supervisory, though non legal or parental, control over minor girls in Costa Rica).

In sex trafficking cases, like the one here, computers are used typically to advertise for and solicit potential prostitution customers on Internet marketplaces such as Craigslist or Backpage. The potential customer, or john, reviews the advertisement and then calls someone designated by the pimp to receive phone calls to make appointments. Some courts have said that in sex trafficking cases, the application of the computer enhancement, and the enhancement under § 2G1.3(b)(1)(B), where the minor victim is "otherwise in the custody, care, or supervisory control of the defendant," are factual inquiries dependent on the particular relationship between the victim and the defendant pimp. *See*, *e.g.*, *United States v. Burnett*, 377 Fed. Appx. 248, 252 (3d Cir. 2010) ("we find it inarguable that, at the time he made the craigslist postings, Burnett exercised a type of 'supervisory control' over [the minor victim]"); *United States v. Patterson*, 576 F.3d 431, 443 (7th Cir. 2009) (rejecting enhancement where the minor was advertised on the internet by another minor who was working for the defendant's half-

9

brother); *United States v. Madkins*, 390 Fed Appx. 849, 851 (11th Cir. 2010), (holding that the district court "arguably erred in applying" the computer enhancement in the case of a pimp advertising for sex with minors, where "[the defendant] placed ads on Craig's List for [the minor victims'] services, but nothing in the record suggests, as the commentary requires, that [the defendant] used a computer or interactive computer service to communicate directly with [the minors] or with a person who exercised care or custody of them."); *United States v. Jennings*, 280 Fed Appx. 836, 844-45 (11th Cir. 2008) (pimp found to have custody, care, and control of a minor victim). The Ninth Circuit, however, has rejected this factual inquiry and categorically limits the definition of "custody, care, or supervisory control" to circumstances where the defendant acts "in loco parentis, in a position of authority over the minor that exists apart from the conduct giving rise to the offense." *United States v. Brooks*, 610 F.3d 1186, 1201 (9th Cir. 2010) (holding that it was error to apply enhancement where defendant met minors after their escape from residential center and acted as their pimp). In other words, the Ninth Circuit would eliminate the factual inquiry and hold categorically that a pure pimp-prostitute relationship could never, in itself, give rise to a finding of custody, care, or supervisory control, since it was a relationship that grew out of the offense.

The Court here need not pass on whether application of the custody, care, or control enhancement or the computer enhancement is a factual or categorical inquiry; here, the actual indicia of custody, care, or supervisory control are minimal, and do not support the application of either enhancement. Thus, as the Court can see from the above analysis, the parties in good faith agreed that in this case, under these facts, the computer enhancement does not apply. Indeed, the

Government's application for this enhancement, under facts more egregious than these, was rejected in 2011 by the Hon. Mark R. Kravitz, United States District Judge, who ruled that:

> I'm not persuaded that the (b)(1), care, custody or control, applies here. I think, as all the cases talk about, it's someone who really is in charge of the person, not as a result of the offense conduct. That, we get through (b)(2). I think the computer one is a closer question, frankly, but I'm not going to enhance by two points, but I will listen to arguments that Mr. Sanderson should be at the top end of the range, which is 262 to 327, okay? . . . So that's my ruling. I'm not going to do the 2G1.3(b)(1), I don't find that it applies. I think the computer question, (b)(3), is a closer question, but reading the cases and the note, I think it's too close to call, in effect.

*United States v. Jarrell Sanderson and Hassanah Delia*, 3:10CR56(MRK), June 6, 2011 Sentencing Hearing of Jarrell Sanderson (relevant part of transcript attached to D. Rivera sentencing memorandum as Exhibit 1).  The Government therefore requests that the Court reject the computer enhancement.  In the event that the Court opts to apply the computer enhancement, the Government respectfully requests that the Court downwardly depart to give effect to the parties' agreement, as it did for D. Rivera.  *See United States v. Fernandez*, 877 F.2d 1138m 1145 (2d Cir. 1989).

**IV.   A GUIDELINES SENTENCE IS REASONABLE UNDER 18 U.S.C. § 3553(a)**

Consideration of the Guidelines and the statutory factors demonstrate that a sentence within the Guidelines range of 78 to 97 months' imprisonment is warranted.  See 18 U.S.C. § 3553(a)(2).

1. Seriousness of the Offense, Respect for the Law, and Just Punishment

The defendant in this case profited from the commercial sexual exploitation of a sixteen-year-old girl.  While the defendant is correct in pointing out that MV-1 had previous "serious personal problems" – indeed, she had been forced into prostitution as a fourteen-year-old by

11

Matthew Lallis – that should not undermine the seriousness of the conduct here. As the defendant points out, "when I first met [MV-1] in May 2011, I should have realized that what she needed was help from experienced professional people. Instead, Dana and I were selfish and self-centered and took advantage of [MV-1]'s vulnerabilities. Instead of acting like an older brother or a good friend, or even like a decent person, I helped Dana and myself at [MV-1]'s expense." PSR ¶ 22. Put differently, the defendant put his own interests above those of a girl who was vulnerable not just because of her age, but also because of a tragic personal history that was clear to those who knew her at the time.

The defendant places the blame for his offense, at least in part, on a tumultuous relationship with his co-defendant and ex-wife, D. Rivera. PSR ¶ 23. That the relationship was troubled is undisputed, and is evidenced by the defendant's four criminal convictions for offenses with D. Rivera as the victim. Moreover, it is also true that, according to MV-1, the defendant began his involvement in this conspiracy several months after D. Rivera did. Nonetheless, we respectfully submit that the Court should be wary of using this relationship as an excuse or even an explanation for conduct that victimized a 16-year-old girl. The defendant did not enter into this conspiracy on a whim, and nor was he coerced into joining with D. Rivera in this exploitative conduct. For the period of his involvement, the defendant was responsible for driving MV-1 to prostitution calls, buying her necessities, posting some of the prostitution advertisements, taking photos for those advertisements, and booking some of the hotel rooms used in the calls. In sum, this was a serious offense in which the defendant was a central participant, and a Guidelines sentence would adequately reflect those important factors.

2. Adequate Deterrence

The defendant has amassed a relatively significant criminal history for his age, centered exclusively around his relationship with D. Rivera. Moreover, his offense in this case was not limited to a single incident or brief period of time; rather, the defendant's involvement in the offense lasted for a month and involved posting advertisements, renting hotel rooms, and driving MV-1 to prostitution appointments. Thus a sentence within the Guidelines range is necessary to deter specifically the defendant's conduct.

A Guidelines sentence is also important to promote general deterrence, that is, so that anyone promoting the prostitution of minors will understand that a federal conviction and significant sentence await. Despite strong federal and state law enforcement efforts, especially since the passage of the TVPA in 2000, prostitution of minors remains a scourge in our society, with some experts estimating that approximately 100,000 American children are lured into prostitution every year. *See* CNN, "FBI: Nationwide child prostitution sweep leads to 104 arrests, 79 children rescued," June 29, 2012 (available at http://www.cnn.com/2012/06/25/us/child-prostitution).

3. Protection of the Public from D. Rivera

The defendant does have a history of violent behavior, specifically a Third Degree Strangulation conviction related to D. Rivera. In his statement to the Probation Office and in his sentencing memorandum, the defendant seems to limit the conduct to the circumstances of that particular relationship. Nonetheless, the defendant's conduct in his relationship with D. Rivera, coupled with his conduct in this case, raises significant concerns regarding his attitudes towards women that clearly affect his ability to conform his behavior to the rules of society. One can

13

hope that a significant sentence of incarceration here, combined with strict supervision and counseling, will significantly diminish the defendant's inclinations to put his own interests above those of his fellow citizens, whatever their gender or personal relationships.

    4. Educational and Vocational Training, and Medical Care and Treatment

The defendant could clearly benefit from substance abuse counseling as well as counseling regarding his attitudes towards women. As the defendant lacks a high school education and has held only unskilled employment, the Government also believes that he should be afforded opportunities during incarceration and in supervised release to further his education and job skills.

## V. CONCLUSION

Based on the foregoing, the Government respectfully submits that a sentence within the advisory Guidelines range of 78 to 97 months' imprisonment is fair, just, and reasonable.

                Respectfully submitted,

                DEIRDRE M. DALY
                ACTING UNITED STATES ATTORNEY

        /s/

                _____
                DAVID E. NOVICK
                ASSISTANT UNITED STATES ATTORNEY
                157 Church Street, 23rd Floor
                New Haven, CT 06510
                Federal Bar No. phv02874

**CERTIFICATE OF SERVICE**

       This is to certify that on June 10, 2013, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Mark D. Myers
United States Probation Officer
157 Church Street
New Haven, CT 06510

                                        /s/
                                _____
                                DAVID E. NOVICK
                                ASSISTANT UNITED STATES ATTORNEY